UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| INTERNATIONAL CORRUGATED AND PACKING SUPPLIES, INC., | § § § | |
| *Plaintiff*, | § § | EP-15-CV-00405-DCG |
| v. | § § | |
| LEAR CORPORATION and LEAR MEXICAN SEATING CORPORATION, *formerly known as* LEAR TRIM, L.P., | § § § § | |
| *Defendants*. | § § | |

## MEMORANDUM ORDER

On May 3, 2019, the Fifth Circuit issued a limited remand in the instant action for this Court to make findings as to whether, when, and under what terms the parties entered into the agreements at issue in this case. *See* ECF No. 94. On June 6, 2019, the Court held a hearing, and the parties presented their witnesses and evidence. *See* ECF No. 99. Having duly considered the parties' pleadings, witness testimony, and exhibits, the Court now enters its Findings of Fact.[1]

### I. APPLICABLE LAW

When adjudicating a motion to compel arbitration, the Court is directed to engage in a two-step analysis. *Washington Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004). The Court must first "determine whether parties agreed to arbitrate the dispute." *Klein v. Nabors Drilling USA L.P.*, 710 F.3d 234, 236 (5th Cir. 2013). This determination is guided by two questions: "(1) is there a valid agreement to arbitrate the claims and (2) does the dispute in question fall within the scope of that arbitration agreement?" *Id.* (quoting *Sherer v. Green Tree*

---

[1] To the extent that any finding of fact is more aptly characterized as a conclusion of law, the Court adopts it as such.

*Servicing LLC*, 548 F.3d 378, 381 (5th Cir. 2008)). Federal courts adopt state-law contract principles when determining the validity of an agreement to arbitrate. *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996) (*per curiam*) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). Thus, "the strong federal policy favoring arbitration does not apply to the initial determination of whether there is a valid agreement to arbitrate." *Klein*, 710 F.3d at 266. Once the Court determines that the parties agreed to arbitrate their dispute, the Court must "consider whether any federal statute or policy renders [Plaintiff's] claims nonarbitrable." *Bailey*, 364 F.3d at 263.

Under Texas law, the party seeking to compel arbitration bears the burden to establish the existence of an agreement to arbitrate. *Ffrench v. PricewaterhouseCoopers Corp. Fin., LLC*, Civ. A. No. H-12-0291, 2012 WL 1900930, at *2 (S.D. Tex. May 24, 2012) (citing *Henry v. Gonzalez*, 18 S.W.3d 684, 688 (Tex. App.—San Antonio 2000, pet. dism'd by agr.)); *Weiner v. Citigroup*, Civ. A. No. 3:01CV2246-M, 2002 WL 655531, at *2 (N.D. Tex. Apr. 19, 2002) (citing *Henry*, 18 S.W.3d at 688–89). The party seeking to compel arbitration must prove by a preponderance of the evidence that such an agreement exists. *See Ffrench*, 2012 WL 1900930, at *2 (citing *Banks v. Mitsubishi Motors Credit of Am., Inc.*, 435 F.3d 538, 540 (5th Cir. 2005)).

## II. FINDINGS OF FACT

1. Plaintiff International Corrugated and Packing Supplies, Inc. ("International Corrugated"), a Texas corporation, sells packaging materials that its customers use to ship products.

2. Defendants Lear Corporation and Lear Mexican Seating Corporation are Delaware corporations with their principal places of business in Michigan and are suppliers of seats and electrical components to automobile manufacturers.

3. Plaintiff provided shipping materials to Defendants from April 2007 until Defendants terminated their relationship in 2014. Ray Hernandez, the President of International Corrugated, testified that Plaintiff filed suit to seek compensation for 198 unpaid transactions. Hr'g Tr. 11:37:00–11.[2]

4. The parties' business relationship began with Plaintiff submitting its quote or price book to Defendants. Defendants used the quotes they received to create a blanket purchase order ("blanket PO") on April 19, 2007. *See* Hr'g Ex. D-1 at 000025. The blanket PO had a delivery date of February 2008. *Id.* Ricardo Perez, Accounting Director for Defendants, testified that the delivery date is the date by which goods must be delivered under the blanket PO, but he also said that a blanket PO can remain open after the delivery date. Hr'g Tr. 11:22:47–23:29. The April 2007 blanket PO had Lear's terms and conditions incorporated by reference in it. Hr'g Ex. D-1 at 000026.

5. Defendants failed to prove that Plaintiff ever received the April 2007 blanket PO. Defendants could not show any emails containing the April 2007 blanket PO being sent to Plaintiff at that time nor could they offer a witness who could testify to Plaintiff receiving the April 2007 blanket PO. Ray Hernandez testified that Defendants never sent the April 2007 blanket PO to him. Hr'g Tr. 11:34:30–59. Further, Defendants could not show that Plaintiff signed any purchase order, including the April 2007 blanket PO, during the time they transacted business. Moreover, Defendants failed to prove that there was a meeting of the minds that the terms and conditions in the April 2007 blanket PO would govern all subsequent transactions between the parties.

6. Josue Olivas, a manager in Defendants' Materials Department, explained that to place an order, he would make a call or send an email to Plaintiff that included the purchasing

---

[2] The Court notes that it is using the timestamps from the transcript for its pincites.

order number ("PO#") from the April 2007 blanket PO and the quantity of the packing supplies needed. Hr'g Tr. 10:59:03–11:00:06. From there, Olivas would wait for Plaintiff to accept the offer and deliver the materials with a packing slip that included the PO#. *Id.* 11:11:55–13:52. Defendants would not accept the delivery if the packing slip did not have the PO# on it. *Id.* 11:03:18–27. Olivas further testified that the most common method of making an offer to Plaintiff was via a phone call. *Id.* 11:11:53–55. Olivas also specified that he received from Defendants' Purchasing Department the vendor and PO# to use when making orders. *Id.* 11:01:02–35.

7. In describing the process for the parties' transactions, Ray Hernandez' testimony was generally consistent with Josue Olivas'. Hernandez testified that Defendants would make orders via phone call or email, with the phone being the most typical method. *Id.* 11:37:33–38:01. Defendants would tell Plaintiff the products and quantities needed, and Plaintiff could choose to accept or deny the offer; Hernandez noted that Plaintiff did deny some orders. *Id.* 11:38:01–15. Further, Hernandez explained that Defendants would sometimes send a filled-out purchase order after Plaintiff accepted Defendants' offer over the phone. *Id.* 11:41:27–58, 11:50:27–53.

8. Hernandez testified that the course of dealing between the parties varied from transaction to transaction. *See id.* 11:37:00–58. However, the typical form a transaction took was Defendants calling to make an offer, Plaintiff accepting the offer over the phone, Defendants following up with paperwork at a later time, Plaintiff delivering the products requested, and Defendants paying Plaintiff thereafter. *Id.* 11:37:33–39:04, 11:41:27–58. According to Defendants, they paid Plaintiff once per month for all deliveries made during that period. *See* Ex. D-23.

9. The Court finds Ray Hernandez' and Josue Olivas' testimony on contract formation to be highly credible. Consequently, their testimony established a typical course of dealing for the parties for the 198 agreements at issue. Defendants typically called Plaintiff with the products sought, the quantities of those products, and the PO# to put on the packing slips.[3] Plaintiff accepted Defendants' offer over the phone and then delivered the products. At some point in the process after Plaintiff accepted the offer, Defendants might follow up by emailing a filled-out purchase order.[4]

10. Further, the Court finds that the April 2007 blanket PO did contain a link purporting to incorporate Defendants' terms and conditions by reference. However, Defendants failed to prove that they ever sent the April 2007 blanket PO to Plaintiff or that Plaintiff had any knowledge of its existence. There was no signature from Plaintiff on the April 2007 blanket PO or any other agreement, and Defendants could not show that there was any understanding between the parties that the terms from the April 2007 blanket PO would govern future agreements.

11. Accordingly, the Court finds that the April 2007 blanket PO does not govern the subsequent agreements, including the 198 separate agreements at issue in this matter.[5]

---

[3] While Defendants also sometimes emailed orders, the testimony established that phone calls were the typical method of contact between the parties.

[4] Thus, Defendants did not send the filled-out purchase orders, with the link purporting to incorporate Defendants' terms and conditions by reference, until after the contracts were formed. *Cf. Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801, 802–05 (Tex. 1991) (holding that an interest provision, contained in an acknowledgement sent after the parties formed a contract through a price quotation and responsive letter, was not part of contract and did not apply to the buyer); *Int'l Metal Sales, Inc. v. Glob. Steel Corp.*, No. 03-07-00172-CV, 2010 WL 1170218, at *4–9 (Tex. App.—Austin Mar. 24, 2010, pet. denied) (holding that a forum selection clause, contained in a set of terms stated on invoices, were not part of underlying contracts because the parties had formed contracts through purchase orders and shipments of goods prior to the buyer receiving invoices containing the forum selection clause).

[5] The Court notes that the terms of a blanket PO can govern subsequent agreements under the right circumstances. *See Sundram Fasteners Ltd. v. Flexitech, Inc.*, No. 08-CV-13103, 2009 WL

Furthermore, because the filled-out purchase orders were not typically sent until after the contracts were formed over the phone in the parties' normal course of dealing, Defendants' terms and conditions, which were allegedly incorporated by reference into the filled-out purchase orders, are not part of the agreements. Consequently, Defendants have failed to meet their burden of establishing the existence of an agreement to arbitrate.

So ORDERED and SIGNED this 3rd day of July 2019.

DAVID C. GUADERRAMA
UNITED STATES DISTRICT JUDGE

---

3763772, at *3, 8–10 (E.D. Mich. Nov. 9, 2009) (enforcing a blanket PO where "[a]t the time the Blanket Purchase Order was issued, Sundram understood what a blanket purchase order was and that it was the controlling document for the [parties]"). *See also generally Detroit Radiant Prod. Co. v. BSH Home Appliances Corp.*, 473 F.3d 623, 631 (6th Cir. 2007) (describing what a blanket PO is). If Defendants had proven that there was a meeting of the minds by showing that Plaintiff received the April 2007 blanket PO at the time and assented to it or had Plaintiff's signature on the blanket PO, the Court would likely have been compelled to find that the blanket PO governed the subsequent agreements. However, Defendants did not provide sufficient evidence for the Court to make such a finding.